UNITED STATES of America, Appellee,

v.

**Robert Wilhelm BRINKMAN, a/k/a Robert H. Mausgrover, Appellant.**

No. 84–5021.

United States Court of Appeals, Fourth Circuit.

Argued June 8, 1984.

Decided July 26, 1984.

Harold J. Bender, Charlotte, N.C., for appellant.

Kenneth P. Andresen, Chief Asst. U.S. Atty., Charlotte, N.C. (Charles R. Brewer, U.S. Atty., Asheville; N.C., on brief), for appellee.

Before MURNAGHAN and SPROUSE, Circuit Judges, and HALLANAN,* District Judge.

MURNAGHAN, Circuit Judge:

Robert Wilhelm Brinkman, also known as Robert H. Mausgrover, appeals from his conviction of violating the Extortionate Credit Transaction Act, 18 U.S.C. § 894(a)(1),[1] and the Interstate Travel Act, 18 U.S.C. § 1952.[2]

---

* The Honorable Elizabeth V. Hallanan, United States District Judge for the Southern District of West Virginia, sitting by designation.

1. § 894. Collection of extensions of credit by extortionate means

   (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

   (1) to collect or attempt to collect any extension of credit, ...

   shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

2. § 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises.

   (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

   (1) distribute the proceeds of any unlawful activity; or

   (2) commit any crime of violence to further any unlawful activity; or

   (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

   and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

   (b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

   (c) Investigations of violations under this section involving liquor shall be conducted under the supervision of the Secretary of the Treasury.

## I.

Brinkman, Manuel Kane and two others formed a company called Ultracept, for the purposes of marketing a machine that separated oil and water. Brinkman, who claimed to have invented the machine, served as a consultant and handled the sales end, while Kane acted as a major investor. Under the terms of the contract with Ultracept, Brinkman received a salary, together with a royalty based on a percentage of the sales; he also received stock in the corporation.

Kane's official title was President and Treasurer, and his responsibilities included paying the bills. In his capacity, Kane handled the checking account and his was an authorized signature on the account. All the royalty payments to Brinkman were made in the form of checks drafted on Ultracept's account and signed by Kane.

The business had trouble getting off the ground, leading to significant losses to Kane, who blamed much of the difficulty on Brinkman's erratic sales effort. In July, 1981, after Kane indicated an unwillingness to make further investments, Brinkman agreed to waive his royalties until the company got back on its feet. Brinkman subsequently did procure a number of sales.

In late 1981, Kane decided to pull out. Brinkman, who had received his full salary and royalty payments through June, 1981, but no royalties since that time, confronted Kane; Kane, however, refused the demand for payment. Brinkman began a series of efforts to obtain payment, beginning with picketing, but moving to threats. In April, 1982, Defendant sent a funeral bouquet to Mrs. Kane, with a black-bordered tag stating "With deepest Sympathy—Soon." In March, 1983, Brinkman allegedly followed, in his car, Kane and a business associate, in what amounted to a high-speed chase through Charlotte, North Carolina.

Word of Brinkman's desire to hire a "hit man" led the FBI to arrange for an informant, known to Brinkman by the alias "Bob Nails," to meet with Brinkman. The meetings confirmed that Brinkman wanted a hit man, and Nails subsequently introduced Brinkman to FBI undercover agent Mike Hartman. Brinkman, in a recorded discussion, described to Hartman how he wanted Kane beaten up, and gave an exact description of where Kane's office was located. At other recorded meetings, Brinkman suggested a tougher course of action.

Hartman thereafter called Brinkman to tell him that Kane had given him $5000. He asked Brinkman to meet him at the Kentucky Fried Chicken on Carowinds Boulevard, one hundred yards over the North Carolina state line in South Carolina. Brinkman met Hartman, and Hartman gave him the $5,000, $800 of which Brinkman returned to Hartman as the collection fee. Brinkman thereafter was arrested by FBI agents after his return to North Carolina.

Brinkman's indictment, returned on July 7, 1983, charged him with two extortionate credit transaction counts in violation of 18 U.S.C. § 894(a)(1), and one count of interstate travel to facilitate extortion, 18 U.S.C. § 1952. Prior to trial, Brinkman moved for the disclosure of the identity and address of Bob Nails, the paid government informant; although the Magistrate ordered disclosure, the district court reversed the Magistrate's order. Brinkman next moved for a dismissal of the Travel Act count based on manufactured jurisdiction; again, the Magistrate recommended that the motion be allowed, but the district court ruled for the government.

Brinkman then filed, pursuant to Fed.R. Crim.P. 17(b),[3] an *ex parte* application for a

---

**3.** Rule 17. Subpoena

* * * * *

    (b) Defendants Unable to Pay. The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is fi-

nancially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense. If the court orders the subpoena to be issued the costs incurred by the process and the fees of the witness so subpoenaed shall be paid in the same manner in which similar costs and fees

court order to subpoena certain witnesses, including Bob Nails. Although the court granted the application, the government learned of the names on the list and, two days prior to trial, successfully moved to quash the subpoena for Nails. Brinkman followed with a motion to dismiss the indictment for abuse of the grand jury process. The motion was denied.

At the close of the government's evidence, at trial, Brinkman moved unsuccessfully for a judgment of acquittal. He was convicted of one of the two 18 U.S.C. § 894 counts and the Travel Act count. He was sentenced to five years' imprisonment for the § 894 count, and three concurrent years for the Travel Act count. On appeal, he challenges each of the court's rulings on his motions.

## II.

### A.

■ Brinkman first contends that his conviction must be reversed for abuse of process, since the government allegedly subpoenaed a potential witness to appear before the grand jury for the sole purpose of using the grand jury process as a discovery tool. The government concedes that a subpoena never should have been issued for the witness.

Even so, the claim must fail. First, in the cases relied upon by appellant, the courts sought to proscribe the attainment and "freezing" of testimony by the prosecution. *See, e.g., United States v. Gibbons,* 607 F.2d 1320 (10th Cir.1979); *United States v. Fisher,* 455 F.2d 1101 (2nd Cir.1972). In each case, therefore, the witness actually testified at the grand jury proceeding, a distinguishable factor since the witness here did not testify. Second, even in those cases the convictions were affirmed, since the appellants there, as here, failed to make the requisite showing

of prejudice. Since the witness did not testify, and no showing of prejudice has been made, Brinkman's abuse of process claim is without merit.

### B.

■ Brinkman's next contention is that the indictment must be dismissed since the government learned of the witness list after Brinkman's *ex parte* application under Fed.R.Crim.P. 17(b) for subpoenas. He properly recognizes that the purpose of the rule is to "shield the theory of his defense from the prosecutor's scrutiny." *United States v. Meriwether,* 486 F.2d 498, 506 (5th Cir.1973), *cert. denied,* 417 U.S. 948, 94 S.Ct. 3074, 41 L.Ed.2d 668 (1974).

Again, the difficulty with Brinkman's position is that he has failed to show that he suffered any prejudice. *Id.,* at 506; *United States v. Brown,* 535 F.2d 424, 429 (8th Cir.1976). The government did not contact any of the witnesses.[4] Brinkman has not shown that any theory of his defense was revealed. The only detriment of any kind that Brinkman can show is that the witness list included the name John Doe, a/k/a Bob Nails, which enabled the government to file a Motion to Set Aside the Court's Order and to quash the subpoena for Bob Nails. Brinkman's *ex parte* application for the subpoenas, however, was filed *after* the court had already denied Brinkman's Motion to Disclose the identity and whereabouts of Nails. Since the only practical effect of the release of the witness list was that it permitted the court to reaffirm and reinforce its previous order with respect to Nails, Brinkman has failed to make the requisite showing of prejudice within the meaning of *Meriwether* and *Brown.*

### C.

The next issue is whether the district court abused its discretion in denying

---

are paid in case of a witness subpoenaed in behalf of the government.

**4.** In *United States v. Sanders,* 322 F.Supp. 947, 952–3 (E.D.Pa.1971), *aff'd,* 459 F.2d 957 (3rd Cir.1972), *cert. denied,* 409 U.S. 860, 93 S.Ct. 146, 34 L.Ed.2d 106 (1972), the court found a

lack of prejudice even where the witnesses were interviewed. *A fortiori,* where no witnesses were interviewed, the fact that the government obtained the witness list, does not, without more, amount to prejudice.

Brinkman's motion for disclosure of the identity and whereabouts of the government informer known only by the alias "Bob. Nails." The seminal case, *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) reversed, on fundamental fairness grounds, a decision upholding the government's refusal to disclose the identity of an informant who was the only other person involved in an illegal heroin transaction. In reaching its result, the court stated:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.*, at 62, 77 S.Ct. at 628. In *McLawhorn v. State of North Carolina*, 484 F.2d 1 (4th Cir.1973), the court applied *Roviaro* in reversing a conviction where the unrevealed informant, who was an undercover detective, and the defendant were the only parties to the drug sale. In so holding, the court stated that

> the privilege of nondisclosure ordinarily applies where the informant is neither a participant in the offense, nor helps set up its commission, but is a mere tipster who only supplies a lead to law investigating and enforcement officers.

*Id.* at 5.

We face, however, a situation in which Nails, the informant, falls somewhere in between the role of a mere tipster and that of a participant in the offense. That Nails was more than a "mere tipster" is clear from the fact that he had two important discussions with Brinkman, established that Brinkman wanted a hit man, and introduced Brinkman to Hartman. On the other hand, it is equally inappropriate to label Nails a "participant" in the offense; the crux of the government's case came from the later, recorded discussions between Hartman and Brinkman, to which Nails was not a party.

That Nails was more than a mere tipster does not lead inexorably to a conclusion that the district court erred in denying the motion for disclosure. In *United States v. Diaz*, 655 F.2d 580, 588 (5th Cir.1981), for example, the court declined to apply the *Roviaro* rule since, "[w]hile the informant here was more than a mere 'tipster,' his involvement in this drug transaction was not as an integral participant."

We therefore must focus not on the labels that may be attached to Nails, but on propriety of the district court's assessment of the *Roviaro* balance in light of "the particular circumstances" of the case. *Roviaro v. United States, supra*, at 62, 77 S.Ct. at 628. The district court balanced the concerns as follows:

> This Court is persuaded that the public interest in maintaining the anonymity of an undercover agent who, according to the Government's statement, is currently involved in other investigations which would be virtually crippled by revealing the agent's true identity, outweighs the need for the Defendant to learn the true identity of an agent who was not a witness or a participant in the crime with which the Defendant has been charged, and was minimally involved with introducing the Defendant to a government agent.

We cannot conclude that the district court abused its discretion in applying the *Roviaro* balance to the particular circumstances of the case, and therefore we affirm the decision denying Brinkman's motion for disclosure.

### D.

The fourth contention is that the government manufactured jurisdiction when undercover agent Hartman asked Brinkman to meet him 100 yards over the border in South Carolina. Brinkman contends, however, that not only should the Travel Act count have been dismissed, but the tapes of

the conversation suppressed, thereby requiring a new trial. Even were we to agree that the jurisdiction was manufactured, the substance of the meeting was admissible for the extortion offense, rendering wholly without merit the claim that a new trial is necessary. Furthermore, since the conviction under the Extortionate Credit Transaction Act can supply the requisite federal court jurisdiction, Brinkman's claim more properly becomes simply an attack on the Travel Act conviction, rather than on the court's jurisdiction.

■ On the merits of the Travel Act claim, there are indeed troubling implications from the fact that the interstate travel occurred solely because agent Hartman selected, as a meeting place, a location one hundred yards over the border into South Carolina. Brinkman's counsel, however, made only a token effort at uncovering an adequate explanation supporting a conclusion of improper purpose for the somewhat dubious turn of events. As counsel admitted at oral argument, the only inquiry he made was to ask Hartman himself for an explanation. When Hartman responded that he was not the case agent, and therefore was not responsible for the decision, counsel made no efforts to obtain an explanation from the case agent.

To conclude that the interstate travel was indeed "manufactured," without the benefit of any explanation on the record as to the basis for the decision determining the location of the meeting, would be to assume that there was no legitimate explanation underlying the choice. We decline to operate from the premise that the government's actions were presumptively improper, and therefore affirm the district court's decision denying the Motion to Dismiss the Travel Act count.

### E.

■ Brinkman's final contentions relate to the district court's denial of his Motion for a Judgment of Acquittal. He first argues that the travel count must fail since the government failed to prove that the substantive offense occurred after the travel. The statute, however, includes no such requirement, and, in keeping with the previous decisions of the circuit, "we will apply the Act as it is written." *United States v. LeFaivre*, 507 F.2d 1288, 1297 (4th Cir.1974) (refusal to read into the act any requirement that the interstate travel be a "substantial" or "integral" part of the activity. *Id.*, at 1296–7).

■ Similarly unpersuasive is the claim that the government failed to prove that a debtor-creditor relationship existed between Kane and defendant, and therefore that the claim under the Extortionate Credit Transaction Act should fail. Subsection 894(a)(1), under which Brinkman was indicted and convicted, proscribes "the use of any extortionate means to collect or attempt to collect any extension of credit." Under § 891(7),

> extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.

Furthermore,

> To collect an extension of credit means to induce in any way any person to make repayment thereof,

§ 891(5). Finally,

> To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of *any debt or claim, whether acknowledged or disputed, valid or invalid,* and however arising, may or will be deferred.

§ 891(1) (emphasis supplied).

Not only does the statute employ expansive language, but "the statute has received a broad construction." *United States v. Totaro*, 550 F.2d 957 (4th Cir. 1977) (construing § 891(1)). As the Ninth Circuit has stated:

> The broad sweep of the extortionate credit statute also has firm foundations in the legislative history of the law.... A more clearly stated open-ended directive by the legislative branch to the

 

executive branch could not have been phrased.

*United States v. Andrino*, 501 F.2d 1373, 1377 (9th Cir.1974). And the Third Circuit has concluded:

> In brief, both the statutory language and legislative history support a broad interpretation of "extortionate extension of credit."

*United States v. Keresty*, 465 F.2d 36, 41 (3rd Cir.1972).

In light of the statute's plain language, and the expansive reading we must give the language, we conclude that Brinkman's activities were well within the scope of the statute. The fact that Brinkman received royalty payments until June, 1981, and then expressly deferred his recovery until after the company was back on its feet is enough to satisfy the requirement of an extension of credit.[5] There can be little doubt that Brinkman employed express and implicit threats of the use of violence to induce the payment of what he perceived to be a satisfaction of his claim for payment of his royalties. The threats were directed at Kane, who, in his official capacity at Ultracept, would have been authorized to agree to the deferral, but also to the resumption, of the payment of the royalties. That Kane disputed whether he owed Brinkman money, or that the debt did not arise from a typical scenario involving a loan, is irrelevant given the expansive language employed by the statute.

■ Finally, Brinkman's claim of a fatal variance between the indictment and proof simply is unfounded. The statement in the indictment that Brinkman sought to recover $68,000 from Kane was in no way undercut at trial by the fact that during their face-to-face confrontation, Brinkman asked for $3,400. Ample evidence at trial showed that Brinkman sought to have Hartman

collect $68,000, and therefore no variance existed.

### III.

For the foregoing reasons, appellant's conviction is

AFFIRMED.

---

**5.** *United States v. Boulahanis*, 677 F.2d 586 (7th Cir.1982), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982), is distinguishable. The court was unable to find "a deliberate act by a creditor." *Id.*, at 590.

> Section 894 does not make it a crime to use extortion to collect debts, but only to exact repayment of credit previously extended.

*Id.* The court recognized, however, that had there "been an agreement to defer payment of a debt, ... such a deferral would be within the reach of section 894." *Id.* Here, Brinkman's agreement to defer payment of the royalties brings his actions within the reach of section 894.