**UNITED STATES of America, Appellee,**

v.

**Frederick Martin PRICE, Appellant.**

**No. 84–5141.**

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1985.

Decided Feb. 21, 1986.

Rehearing Denied March 20, 1986.

Martha F. Rasin (Bruce C. Bereano, Annapolis, Md., on brief) for appellant.

Barbara Sale (J. Frederick Motz, U.S. Atty., Wendy P. Arnell, Asst. U.S. Atty., Baltimore, Md., on brief), for appellee.

Before MURNAGHAN, ERVIN and SNEEDEN, Circuit Judges.

ERVIN, Circuit Judge:

This is an appeal from a conviction for conversion of the property of a common carrier used in interstate commerce in violation of 18 U.S.C. § 660. Frederick Martin Price was charged in a three count indictment with theft from an interstate shipment, converting the property of a common carrier, and breaking and entering carrier facilities following an alleged attempted sale of a truckload of meat in August of 1983. A confidential informant of the Drug Enforcement Administration played a role in the events leading to Price's arrest. Prior to trial, Price sought disclosure of the identity of the informant. The district court denied Price's motion without a hearing. A bench trial was held in March 1983, and Price was found guilty of conversion on count two. Price now appeals arguing (1) that the district court erred in refusing to compel the disclosure of the identity of the confidential informant, (2) that insufficient evidence was presented at trial to establish that the trailer and its contents belonged to Apple Lines, a common carrier, to support a conviction under 18 U.S.C. § 660, and (3) that there was insufficient evidence of conversion. Finding merit to Price's first argument, we reverse and remand the case for a new trial.

I.

At the time of his arrest, Price was a truck driver for Apple Lines, Inc. of South Dakota. On August 1, 1983, on orders from Apple Lines, Price picked up a load of meat from Val-Agri, a meat company in Garden City, Kansas. After Price's truck was loaded, a wire seal was placed on the doors of the truck. It was to be broken only when the load was delivered to the purchaser, Safeway Stores, Inc., in Landover, Maryland, under Safeway's supervision. Price drove to Maryland and arrived at the Safeway depot at approximately 4:30 or 5:00 p.m. on August 3. Price had been delayed due to freeway construction on his route, and consequently had missed his scheduled time to unload the meat. Price telephoned Apple Lines to inform them of this development, and the company instructed him to find a truck stop and lay over for the night. Safeway personnel recommended that Price go to a truck stop in Jessup, Maryland. Price was instructed to return to the Safeway depot at 6:00 a.m. the following morning to unload the meat.

Price proceeded to the Jessup truck stop, but was unable to secure a vacant room. He slept that night in his truck. The following morning he left Jessup at 4:30 or 4:45 a.m. and arrived at the Safeway depot at approximately 5:45 a.m., only to learn that there had apparently been a misunderstanding between the Apple Lines dispatcher and Safeway personnel regarding the unloading time. Safeway told Price that they had expected him at 4:00 a.m., not 6:00 a.m. As a result, Price was again unable to deliver his load. He called the Apple Lines dispatcher, who contacted Safeway.

Although Safeway agreed to try to work Price in before they closed that day, Price was not allowed to unload that day. He again contacted Apple Lines. The company agreed to put Price up for the night in a hotel.

Price asked around to locate a reasonably priced hotel that could accommodate his rig in the parking lot. Someone recommended a Holiday Inn in Bowie, Maryland. Price drove to the hotel only to be informed that it would not accept the Apple Line's credit system. A Holiday Inn employee referred Price to "Rip's" motel, which was frequented by truckers. Price drove to Rip's, but that motel also refused to honor the form of credit Price had available to him.

It was now approximately 1:00 p.m. on the afternoon of August 5. Price, quite frustrated by this point, again telephoned Apple Lines. He told the company that he had been "driving around in circles" all day and that he "just wanted to get some rest and be able to relax." (JA 219). Apple Lines agreed to compensate Price for staying with the rig another night. After making sure that the truck was parked in a safe place, Price went to Rip's Restaurant for lunch and then Rip's Bar for drinks. Price spent most of the rest of August 5 at the bar, leaving once to purchase low price beer and a second time to play pool with another Rip's patron at a different bar in the vicinity. On at least one of these occasions, Price did not drive because he had been drinking.

Also passing the day at Rip's bar was a confidential informant of the Drug Enforcement Administration ("DEA") and a companion of the informant. These men identified themselves as Maryland crabbers and were simply referred to at trial as "the crabbers" because their identity remains undisclosed. Price met the crabbers at Rip's and talked about crabbing with them. In the course of the conversation, Price related the facts that he was a trucker and had a truck load of meat, and told them of

the difficulties he had encountered trying to get rid of his load.

There are two versions of what transpired after Price met the crabbers and disclosed his predicament to them. DEA Special Agent William R. Nelson testified at trial that at about 4:00 p.m. on August 5 he received a telephone call from the informant crabber indicating that the informant was at Rip's and in the company of a truck driver who had offered to sell a tractor-trailer full of meat. Nelson told the informant to remain with the trucker and to call him back. At approximately 4:30 p.m., the informant called Nelson and indicated that the trucker's rig had the name Apple on it. During this phone call Nelson was able to overhear a conversation between the informant and an unidentified third person. Nelson engaged in a three-way conversation with the two of them. He asked the informant where the meat came from. The unidentified person responded to the informant that it was from Garden City. Nelson next asked how old it was; the unidentified person indicated that it was two days old. Nelson then asked "how much for the truck trailer and beef meaning how much money. The overheard response was it is worth more but $10,000 cash will do." (JA 271). Nelson testified that he then "overheard a portion of a conversation between the informant and this unknown individual ... [who said that] the beef was going to go to Safeway but it was refused and it would be accepted tomorrow. After delivery take me 30 miles up the road or to an airport. And that was the conversation I overheard between the informant and this unknown individual." (JA 272). According to the government, this "unknown individual" involved in the 4:30 p.m. phone call was Price.[1]

In contrast, Price testified that he left Rip's to play pool at approximately 4:00 p.m. and headed back to Rip's at approximately 6:45 p.m. Defense witness Donald R. Weaver corroborated Price's testimony in part. Weaver testified that he and Price

---

**1.** As discussed *infra,* no government witness testified from personal knowledge that Price was,

in fact, the unidentified person involved in the telephone conversation.

**1135**

left Rip's at approximately 4:00 p.m. to play pool, and that the two were at the pool hall until approximately 5:00 p.m. At that time Weaver left the pool hall, but Price did not.[2] Consequently, the testimony of Price and Weaver suggest that Price was not at Rip's at the time of the 4:30 p.m. phone call to Agent Nelson.

Price testified that he telephoned Apple Lines at 7:30 and 7:52 p.m. to check in and tell the dispatcher how he could be reached. According to Price, after he got off the phone he was approached by the crabbers. They allegedly led him out of sight of other Rip's patrons, and then proceeded to threaten him. Price testified that the informant said to him:

> You are not going anywhere with that truck. He says that's ours now and he said you try to do anything or anything he says your life will be in jeopardy and he went like this and showed me that he had something stuck down in his pants which resembled a gun to me.

Q. Then, what happened?

A. He told me to walk out the door to my truck.

Q. Then, go ahead?

A. I walked out the door in the company of these two gentlemen. Upon reaching outside walked me over to a car and he said there was another gentlemen standing there. He said this is the gentleman that's going to take your truck and I said whatever you say, man, it's yours, you know, I don't argue with somebody that messes with my life. So—

Q. At this point, did you feel that your life was in danger?

A. Yes, sir, I did, because I was somewhat intoxicated and this gentleman apparently had a gun.

(JA 228–29).

According to the testimony of FBI Special Agent David M. Zacur, the DEA informant and Zacur drove to Rip's in the infor-

mant's truck. Zacur had with him $10,000 in cash. When they arrived at Rip's, the informant went into Rip's while Zacur remained outside. About five minutes later the informant came back outside along with Price and an unidentified individual. The informant approached Zacur to tell him that Price had "some business." The informant then introduced Price to Zacur. Zacur testified that Price asked him whether he was interested in purchasing the load of meat. Zacur indicated an interest, but said that he wanted to inspect what he was purchasing. In the presence of the informant and the unidentified person, Price handed Zacur a portfolio containing documents describing the load and a Polaroid photograph of the load. Zacur then indicated that he wished to examine the contents of the rig and proposed that they proceed to the Holiday Inn parking lot to complete the transaction. Price drove Zacur in the Apple Lines truck to the Holiday Inn. The informant drove over separately and parked in a section of the lot out of view of the truck. On the way, Price allegedly asked Zacur if he had the money with him. Zacur replied that he did and displayed a stack of fifty-dollar bills. Subsequently, Price asked if, after the deal was completed, Zacur would drop him four to eight miles down the road so that Price could call his employer and indicate that he had been hijacked.

Zacur further testified that after he and Price arrived at the Holiday Inn, he asked Price if he had anything with which to break the wire seal on the load. Zacur testified that Price said he did not. (JA 97). In fact, Price had tools in the truck which could have been used for that purpose. (JA 234). Zacur then walked over to where the informant was parked and obtained a pair of channel locks from him. According to Zacur, he returned along with FBI Special Agent John Friel, and introduced Friel to Price as his partner. Zacur gave the channel locks to Price and told

---

**2.** Weaver also testified that after he returned to Rip's he saw Price in his truck at approximately 5:15 p.m. Price testified that he could not have been in his truck at 5:15 p.m. because he remained at the pool hall until approximately 6:45 p.m.

him to open the truck. Price apparently tried to break the seal but claimed that he could not. Zacur then broke the seal with no difficulty. He entered the truck and inspected the load. He then placed Price under arrest. (JA 73–101).

Agent Friel testified regarding the circumstances of his meeting Price at the Holiday Inn. Friel was in the Holiday Inn bar when Zacur, Price and the informant arrived at the motel. According to Friel, the informant and the informant's unidentified companion came into the bar, sat down with Friel and told him that Price and Zacur were parking the truck. The informant left the bar and, a short while later, the unidentified companion left as well. The informant then returned with Price and introduced him to Friel. At some point the informant again left the bar. Friel testified that he and Price then engaged in a conversation in which Price indicated that he wished to sell his load for $10,000. Friel informed Price that he wanted to have the load dropped off in New Jersey. Friel and Price then went into the parking lot where Zacur was waiting with the truck. (JA 110–12, 117–121).

Price's testimony differs somewhat from that of the agents. He claims that after his conversation with the crabbers, during which they allegedly threatened him, the crabbers escorted him out to his truck and directed him to get inside. Zacur, who had been outside with the truck, got in on the passenger side. The crabbers instructed Price to do what Zacur said. Price testified that Zacur told him to drive to the Holiday Inn and that on the way Zacur asked to see the truck's portfolio. He testified that after they arrived at the Holiday Inn, Zacur, not the informant, escorted him into the bar to meet Friel.[3]

Price was indicted on August 16, 1983 by a federal grand jury for the alleged attempted sale. The three count indictment charged him with theft from an interstate shipment, in violation of 18 U.S.C. § 659;

converting the property of a common carrier used in interstate commerce, in violation of 18 U.S.C. § 660; and breaking and entering carrier facilities, in violation of 18 U.S.C. § 2117. Price was arraigned on August 30, 1983; he entered a plea of not guilty on all counts.

On September 12, 1983, Price filed a motion to compel disclosure of the identity of the DEA informant. The government opposed the motion, and on February 17, 1984, the district court denied the motion without a hearing. Under this circuit's rule that disclosure of an informant is required when the informant is a "participant" in the event and not required when the informant is a "mere tipster," *McLawhorn v. North Carolina*, 484 F.2d 1, 5 (4th Cir.1973), the district court found that "[d]isclosure is not required in this instance because [the] informant ... was merely a tipster who led to the eventual contact between the FBI agents and the defendant." (JA 13).

On March 6, 1984, Price waived his right to a jury and the case proceeded to trial. At the request of the government, count three of the indictment alleging breaking and entering was dismissed. At the close of the government's case, Price moved for judgment of acquittal. The district court granted the motion as to count one alleging theft from an interstate shipment, and denied the motion as to count two alleging conversion of the property of a common carrier. At the close of all the evidence, the court found Price guilty of conversion on count two.

Price subsequently filed a motion for a new trial and to set aside the guilty verdict, which was denied by the district court. The court then sentenced him to two years, with all but ninety days suspended.

Price now appeals his conviction. He argues that the district court erred in refusing to compel disclosure of the identity of the informant and that the denial of his motion to compel disclosure was prejudicial

---

3. It is not possible to tell from the record whether some inconsistencies in the testimony of Price, Zacur and Friel are due to lapses of memory, lapses of credibility, or some other factor such as Price's admitted intoxication at the time these events occurred.

to his case because his defense was based on duress and entrapment. He further argues that there was insufficient evidence presented at trial to establish that the trailer and its contents belonged to Apple Lines and that there was insufficient evidence of conversion of the truck, trailer and meat to support a conviction on count two.

## II.

In *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court recognized the "informer's privilege." According to the Court:

> What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.... The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

*Id.* at 60, 77 S.Ct. at 627 (citations omitted). While an informant's identity will often be privileged from disclosure, there are limits to the scope of that privilege arising from

> fundamental requirements of fairness. Where the disclosure of an informer's identity or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.

*Id.* at 60–61, 77 S.Ct. at 627–628 (footnotes omitted). The Court determined that "no fixed rule with respect to disclosure is jus-

tifiable." *Id.* at 62, 77 S.Ct. at 628. Rather,

> the problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.*

The role played by the informant in *Roviaro* is somewhat analogous to the role played by the informant in this case. In *Roviaro*, the defendant was convicted of the sale of heroin and of knowing concealment and transportation after importation of heroin. An informant was involved in the events leading to Roviaro's arrest. During a material part of the criminal enterprise, a police officer hid in the trunk of a car while Roviaro and the informant engaged in a conversation about the drug deal and the informant drove to the pick-up point. The officer testified at trial regarding the conversation between Rovario and the informant, which the officer overheard.[4] At trial, the informant's part in the transaction was described by government witnesses. Rovario sought disclosure of the informant's identity, and when the government refused, the district court did not compel disclosure. The Supreme Court found that the district court

> committed reversible error when it allowed the Government to refuse to disclose the identity of an undercover employee who had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material

---

**4.** As they drove, Rovario asked the informant about money the latter owed him and told the informant he had brought "three pieces this time." Rovario directed the informant where to drive, and told him where to stop. Once the car stopped, the officer watched from the trunk as Rovario walked to a tree and picked up a package. Rovario gave the package to the informant, saying "Here it is, "and "I'll call you in a couple of days." *Id.* at 56–57, 77 S.Ct. at 625–626.

witness as to whether the accused knowingly transported the drugs as charged. *Id.* The Court found that the charge against Roviaro, "when viewed in connection with the evidence introduced at the trial, is so closely related to [the informant] as to make his identity and testimony highly material." As the Court explained, "[t]he circumstances of this case demonstrate that [the informant's] possible testimony was highly relevant and might have been helpful to the defense." *Id.* at 63–64, 77 S.Ct. at 629. The defendant's ability to cross-examine the police officers involved was

> hardly a substitute for an opportunity to examine the man who had been nearest to him and took part in the transaction. [The informant] had helped to set up the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment. He might have thrown doubt upon petitioner's identity or on the identity of the package. He was the only witness who might have testified to petitioner's possible lack of knowledge of the contents of the package that he "transported" from the tree to [the informant's] car. The desirability of calling [the informant] as a witness, or at least interviewing him in preparation for trial, was a matter for the accused rather than the Government to decide.

*Id.* at 64, 77 S.Ct. at 629. The Court believed that the government's use at trial of the defendant's conversation with the informant

> particularly emphasizes the unfairness of the nondisclosure in this case. The only person, other than petitioner himself, who could controvert, explain or amplify [the officer's] report of this important conversation was [the informant]. Contradiction or amplification might have borne upon petitioner's knowledge of the contents of the package or might have tended to show an entrapment.

*Id.* The Court reversed the conviction and remanded the case to the district court. *Id.* at 66, 77 S.Ct. at 630.

In applying *Roviaro*, this court has drawn a distinction between informants who are "participants" in a criminal transaction, and those who are "mere tipsters." *United States v. Brinkman*, 739 F.2d 977, 981 (4th Cir.1984); *McLawhorn v. State of North Carolina*, 484 F.2d 1 (4th Cir.1973). In *McLawhorn* we held that

> disclosure of the informant's identity is required where the informant is an actual participant, particularly where he helps set up the criminal occurrence.... Therefore, one of the factors tending to show that the prosecution is not entitled to withhold from the accused information as to the identity of an informant is the qualification of the informant to testify directly concerning the very transaction constituting the crime.
>
> On the other hand, the privilege of nondisclosure ordinarily applies where the informant is neither a participant in the offenses, nor helps set up its commission, but is a mere tipster who only supplies a lead to law investigating and enforcement officers.

*Id.* at 5 (citations omitted); *accord United States v. Barnes*, 486 F.2d 776, 778–79 (8th Cir.1973). We emphasized that

> [o]rdinarily, knowledge of the identity of a tipster would not be essential in preparing the defense of the accused and the public interest in protecting such informants should weigh heavily in favor of nondisclosure. However, where the informant is an actual participant, and thus a witness to material and relevant events, fundamental fairness dictates that the accused have access to him as a potential witness. In such instances disclosure of identity should be required.

*Id.*

In *McLawhorn*, the informant set up the criminal transaction and participated in its execution. The court found that the informant was a "material witness who could testify directly from personal knowledge" regarding the crimes with which the defendant was charged. Consequently, "his testimony was mandated in order to accomplish the purpose of a criminal trial—find-

ing the truth." *Id.* at 7. The court held that where an informant is a participant in a criminal enterprise, a defendant is not required to present proof of his or her need for the informant's testimony. Such a requirement would "place an unjustifiable burden on the defense," particularly where alleged entrapment is contrived and perpetrated by the informant. *Id. McLawhorn* also recognized that informants often have a pecuniary interest in the arrest of the defendant, which increases the risk of entrapment.[5] *Id.* at 7 n. 18. The informant in *McLawhorn* "participated" in the criminal incident through attempting to arrange a sale of drugs by the defendant, meeting with him in private, introducing him to the federal agent, riding in a car with the agent and the defendant and participating in the sale. *Id.* at 6.[6] The court concluded that under these circumstances, the trial court had erred in refusing to compel disclosure of the informant's identity. *Id.*[7]

In the case at bar, the government argues that disclosure of the informant's identity was not required because the informant was "barely more than a mere tipster." Appellees' Brief at 12. However, the informant in this case did much more than tip off the government regarding Price's alleged desire to sell his rig. The informant set up the deal. He was a necessary party to the telephone negotiations which led to the attempted sale. It was in the course of the phone call that the informant communicated the alleged offer of sale to the agent, an unidentified person alleged to be Price named his price and both sides, through the informant, agreed. The informant was clearly an "active participant" in this episode under *McLawhorn*. Further, because agent Nelson did not know the identity of the alleged trucker during the phone conversation, the informant and his partner[8] are the only witnesses who can testify as to whether Price was, in fact, the party to the negotiations. *Cf. Rovario*, 353 U.S. at 54, 77 S.Ct. at 624. The government's failure to present evidence linking Price to the telephone negotiations is particularly troublesome in light of the fact that Weaver, a disinterested witness, corroborated Price's testimony that he could not have been at Rip's at the time the call was made.

The informant's involvement did not cease after the sale had been arranged. The informant introduced Price to agent Zacur, drove to the Holiday Inn and supplied Zacur with channel locks to break the seal on the truck. According to Agent Friel, the informant also brought Price into the Holiday Inn bar to introduce him to Friel. Further, as in *McLawhorn*, Price wished to present a defense premised on duress or entrapment contrived and perpetrated by the informant. Under these circumstances, as in *Roviaro* and *McLawhorn*, the district court's refusal to compel disclosure of the informant's identity denied Price a fair trial.

### III.

Having concluded that the district court erred in refusing to compel disclosure of

---

5. In the case at bar, the crabbers were allegedly paid $1200 for their participation in Price's arrest. Brief of Appellant at 11.

6. In *Brinkman,* we found that the informant in that case was "somewhere in between the role of a mere tipster and that of a participant in the offense." 739 F.2d at 981. The informant ha[d] had two important conversations with the defendant, had "established that [the defendant] wanted a hit man," and had introduced the defendant to government agents. However, the informant was not a party to the discussions which formed the "crux of the government's case." He "was not a witness or a participant in the crime with which the Defendant ha[d] been charged." *Id.* The district court found that under these circumstances, the government's interest in maintaining the informant's anonymity outweighed the defendant's interest in disclosure of the informant's identity. This court held that the district court did not abuse its discretion. *Id.*

7. *McLawhorn* involved a federal habeas corpus challenge to a state criminal conviction. The court reversed the district court's denial of relief and remanded the case to the district court with instructions that the defendant should be released from custody unless the state chose to retry him within a reasonable period of time. *Id.* at 8.

8. The identity of the informant's partner has also been shielded from disclosure.

the informant's identity, we turn to the question of whether to reverse the conviction, or simply remand the case to the district court for an evidentiary hearing. In *Rovario* and *McLawhorn*, it was apparent from the record that the informants were so closely connected with the criminal transactions in those cases that failure to disclose their identity was reversible error. Neither court ordered a remand for an evidentiary hearing. In some cases involving confidential informants, however, courts have remanded the cases for a hearing, either to engage in the *Rovario* balancing test or to assess the harm to the defendant's case of a wrongful failure to disclose an informant's identity.

In *Gaines v. Hess*, 662 F.2d 1364 (10th Cir.1981), for example, the court found that the trial court's refusal to compel disclosure of the identity of an informant who set up a drug sale and was a material witness to the sale would violate the defendant's due process rights "if in fact the informant could provide potentially significant exculpatory testimony." *Id.* at 1368. The Tenth Circuit remanded *Gaines* for an *in camera* hearing to determine "whether the informant's testimony would lend significant credence to [the defendant's] defense." *Id.* at 1369. If the district court found that the informant would make an exculpatory witness, the state would be required to retry the defendant with the informant present or release the defendant from custody. *Id.* *See also United States v. Freund*, 525 F.2d 873, 877–78 (5th Cir. 1976) (remanding case for an evidentiary hearing to determine whether *Rovario* required disclosure where the informant was simply a witness to an alleged improper search). In *United States v. Barnes, supra*, the Eighth Circuit remanded the case to the district court for an evidentiary hearing on the question of whether the defendant had been prejudiced by the government's refusal to disclose the informant's identity. Having determined from the record that the failure to disclose was in error, the *Barnes* court did not suggest that the district court conduct an *in camera* hearing. Rather, the informant was to be examined with the defendant and counsel present. 486 F.2d at 780–81.

■ As the Fifth Circuit recognized in *Freund*, the propriety of remanding a case for an evidentiary hearing depends on the particular circumstances of the case. "[T]here will be circumstances in which an *in camera* hearing is either unnecessary or insufficient to protect the defendant's rights." 525 F.2d at 878; *see also Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968) (conviction reversed without remand for a hearing where trial court refused to allow defense counsel to question informant as to his real name and address). The case at bar bears important similarities to *Rovario* and *McLawhorn*, making remand for an evidentiary hearing both unnecessary and inappropriate in light of those authorities. In this case, as in *Rovario* and *McLawhorn*, the informant set up the criminal transaction. In all three cases, the informant was a material witness who could testify to the defendant's knowing participation in the crime. In *Rovario*, as here, a government agent overheard a conversation between the informant and a person alleged to be the defendant, and testified about the conversation at trial. The Supreme Court found that such testimony "particularly emphasiz[ed] the unfairness of nondisclosure" in *Rovario*. 153 U.S. at 64, 77 S.Ct. at 629.[9] In *McLawhorn*, as in this case, the defendant wished to present evidence of entrapment perpetrated by the informant.

Due to the similarities in these cases, it is clear from the record before this court that disclosure in this case was required as a matter of law.[10] Accordingly, Price's con-

---

**9.** This is especially true in this case where the informant and his undisclosed companion are the *only* witnesses who can testify as to whether Price was involved in the telephone conversation overheard by Agent Nelson, and where Price and a disinterested witness testified that Price could not have been at Rip's at the time the call was made.

**10.** In light of our disposition of this issue, we need not reach the question of whether sufficient evidence was presented at trial to sustain a

viction is reversed and the case remanded for a new trial.[11]

REVERSED AND REMANDED.

SNEEDEN, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision to reverse the trial court and compel disclosure of the confidential informant's name. Although he was more than a mere "tipster," the informant in this case did not participate in the unlawful conversion of property, nor did he help to set up the criminal occurrence. Furthermore, since Price did not legitimately allege entrapment or duress, disclosure of the informant's identity would not have significantly assisted him in his defense. Thus, I believe the majority erred in concluding that Price's interest in learning the informant's identity outweighed the public's interest in guarding this confidential information.

The cornerstone of the majority's opinion is *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), in which the Supreme Court held that, based on the facts of that case, disclosure of an informer's identity was required by fundamental notions of fairness. In reaching its conclusion, the majority also relies heavily on *McLawhorn v. State of North Carolina*, 484 F.2d 1 (4th Cir.1973), a decision by this court requiring disclosure of an informant's identity "where the informant is an actual participant (in the crime), particularly where he helps set up the criminal occurrence...." *Id.* at 5. *Roviaro* and *McLawhorn* are, however, distinguishable from the case at hand.

In *Roviaro*, the Supreme Court noted that the purpose behind the privilege of nondisclosure is the furtherance and protection of the public interest in effective law enforcement. 353 U.S. at 59, 77 S.Ct. at 627. The Court noted that this privilege is limited. *Id.* at 60, 77 S.Ct. at 627. However, the Court refused to articulate a fixed rule defining when disclosure is justifiable. *Id.* at 62, 77 S.Ct. at 629. Instead, the Court stated that a balancing test must be performed—the public interest in protecting the flow of information balanced against an individual's right to prepare his defense. *Id.* Factors to be weighed included consideration of the crime charged, possible defenses, the possible significance of the informer's testimony and "other relevant factors." *Id.*

The facts of *Roviaro* compelled the tipping of the scales in favor of disclosure. The defendant in that case was accused of knowingly and fraudulently receiving, concealing, buying and facilitating the transportation and concealment of heroin with the knowledge that the drug was unlawfully imported into the United States. 353 U.S. at 54, 77 S.Ct. at 624. The testimony of the confidential informant in *Roviaro* would be directly related to these charges because the informant had helped to set up the criminal occurrence and played a prominent part in it. 353 U.S. at 64, 77 S.Ct. at 629. The informant's testimony might have cast doubt upon the identity of the defendant or the package of drugs he was accused of transporting. Furthermore, the informant was the only witness who might have testified to the defendant's possible lack of knowledge of the contents of the

conviction under 18 U.S.C. § 660. We simply note, to aid the parties and the district court upon retrial, that the statute concerns conversion of the "moneys, funds, credits, securities, property, or assets" of a common carrier. To the extent the government wishes to establish conversion of the meat, as opposed to conversion of the tractor-trailer, the government must present evidence to show that the meat falls within the terms of the statute.

11. Because the trial in this case was not a jury trial and retrial will therefore most likely be before the same trier of fact—the original dis-

trict judge—a full retrial may not be necessary. The district judge may, in his discretion, limit the scope of evidence presented on retrial in a manner which allows the defendant to fully pursue the significance of the informant's role in the incident and at the same time does not engage the court in needless repetition of matters fully developed during the first trial.

It may, however, be the case that the unavailability of the informant as a witness was a material factor in Price's decision not to exercise his right to a jury trial. If so, Price must be afforded the option to exercise that right upon retrial.

drug package he transported to the informer's car. *Id.* Finally, the informant was the only person, other than the defendant himself, who could controvert, explain or amplify the report of a police officer who eavesdropped on a conversation between the defendant and the informant in which the accused directed the informant to the site of the drug pickup. *Id.* The officer, hidden in the trunk of the informant's car, reported that he had observed the defendant exit from the car, walk to a tree, pick up a package, return to the car, deposit the package and had heard the defendant advise the informant that he would call him in a couple of days. 353 U.S. at 57, 77 S.Ct. at 626. The informant's testimony in *Roviaro* was thus material and highly relevant.

The facts of the *McLawhorn* case also indicate that the testimony of the confidential informant was critically important to the defendant. The informant in *McLawhorn* was working with a police detective in an undercover drug investigation. 484 F.2d at 3. The informant told the detective that the defendant McLawhorn was involved in drug trafficking and offered to arrange a cocaine sale. *Id.* The informant later spotted McLawhorn driving a car and signaled him to stop. Following a brief conversation, the informant introduced the detective to McLawhorn as a potential customer. *Id.* The informant negotiated a sale of one gram of cocaine. Then, according to the detective's testimony, McLawhorn sold the drug to both he and the informant. *Id.* McLawhorn was later charged with illegal transportation, possession and sale of a narcotic drug. *Id.*

The informant's role in *McLawhorn* thus made his testimony highly relevant. The informant set up the drug deal, negotiated a price and actually participated in the sale of the cocaine. The informant's role in the present case was far more limited. The confidential informant's involvement here consisted of alerting federal authorities to the fact that a truck driver in a bar announced he would sell his shipment, intro-

ducing the driver to federal agents and traveling to the location at which the truck and its contents were to be sold. The informant did not participate in negotiations for the actual sale. Instead, defendant Price identified himself to F.B.I. Agent Zacur as the driver of a truck loaded with meat. The defendant inquired whether Zacur wanted to buy the truck, trailer and contents for $10,000. Responding, Zacur indicated that if an inspection verified Price's description of the truck's cargo, a purchase price of $10,000 would be agreeable. The agent told Price, however, the sale must occur at a nearby hotel.

The confidential informant traveled to the hotel and introduced Price to another federal agent whom he described as Zacur's associate. The informant did not ride to the hotel with Price or Zacur. The informant's involvement, for all practical purposes, ended at this point. Although he was on the hotel premises, the confidential informant was not present when Price opened the truck trailer's door to display the cargo to Zacur. Nor was the informant present when the agents arrested Price. In fact, the informant did not even witness the crime. He was positioned in front of the hotel restaurant while Price, Zacur and the truck were located behind the restaurant. Thus, since the confidential informant did not play a material role in the consummation of the crime of conversion and was not present when the crime was committed, this case is clearly distinguishable from *Roviaro* and *McLawhorn*.

The facts in this case are much more analogous to those found in our recent decision of *United States v. Brinkman*, 739 F.2d 977 (4th Cir.1984). In *Brinkman* we held that the district court did not abuse its discretion in denying the disclosure of the identity and location of a government informant. *Id.* at 981. Brinkman was convicted of violating the Extortionate Credit Transaction Act,[1] and the Interstate Travel Act.[2] His problems with the law stemmed from an unhappy busi-

---

1. 18 U.S.C. § 894(a)(1).

2. 18 U.S.C. § 1952.

ness venture with Manual Kane. *Id.* The F.B.I. learned that Brinkman wished to hire a hit man to beat up Kane. *Id.* at 979. Agents arranged for a confidential informant to meet Brinkman. The informant introduced Brinkman to an undercover agent who was described as a hitman. *Id.* Brinkman told the agent where to find Kane and how to beat him to ensure payment of an alleged $5,000 debt. The agent later notified Brinkman that he had collected the debt. Brinkman was arrested after attempting to pay the "hitman" for his services. *Id.*

In assessing the role of the confidential informant in *Brinkman,* this court concluded that the informant's participation in the case did not warrant disclosure of his identity:

> We face, however, a situation in which Nails, the informant, falls somewhere in between the role of a mere tipster and that of a participant in the offense. That Nails was more than a "mere tipster" is clear from the fact that he had two important discussions with Brinkman, established that Brinkman wanted a hit man, and introduced Brinkman to Hartman. On the other hand, it is equally inappropriate to label Nails a "participant" in the offense; the crux of the government's case came from the later, recorded discussions between Hartman and Brinkman, to which Nails was not a party.

739 F.2d at 981. In the case at hand, the confidential informant was also more than a tipster yet less than a participant in the offense. The informant alerted the F.B.I. to the defendant's public announcement that he wished to sell his rig and its cargo. Furthermore, the informant introduced Price to government agents posing as buyers. However, the key negotiations for the sale of the truck and its contents were solely between the defendant and agent Zacur. Moreover, the informant could hardly be labeled a participant in the illegal conversion since he was not present and did not witness the actual criminal occurrence.

Following *Brinkman* then, this court should decline to require release of the informant's name.

Price does not cite *Brinkman* in his brief. The majority acknowledges the existence of the decision in footnote six but does not attempt to distinguish the case. I believe *Brinkman* is on point and controlling. Critics may assert that the present case is distinguishable because entrapment and duress are alleged here but were not issues in the Brinkman case. However, this is a distinction without a difference. Price has merely baldly asserted that he was entrapped. More than mere allegations must be forthcoming to force the release of a confidential informant's name. *See United States v. Smith,* 780 F.2d 1102, 1107 (4th Cir.1985) (en banc) (court requires more than mere speculation on usefulness of disclosure of informant's identity). Otherwise, the privilege of confidentiality would be lost automatically upon the inclusion of certain statements in a complaint.

Furthermore, although he articulated more facts to support his defense of duress, Price failed to convince the trial court that he was forced into the illegal sale. The defendant's testimony on the issue was inherently suspicious. He admitted that he never saw a weapon displayed by men who allegedly threatened him. Price never mentioned threats to his trucking dispatcher and gave inconsistent testimony over whether the threats came before or after his last call to the dispatcher.[3] Furthermore, although he stated that he was threatened there earlier, Price returned to Rip's bar after traveling to another bar to play pool and shoot darts. This behavior is inconsistent with the assertion that Price felt his life was threatened at Rip's.

The district court had the opportunity to judge the credibility of all the witnesses including the defendant. Judge Ramsey chose not to believe Price's allegations of duress and entrapment. The informant's testimony on these issues was therefore not required. This court, working from a

---

3. Joint Appendix at 143–44.

cold record, should not attempt to second guess the trier of fact. Clearly, the record demonstrates that the district court did not abuse its discretion in refusing to require disclosure of the informant's identity following bald allegations or allegations supported by conflicting testimony and behavior that belies the defendant's assertions.[4]

· In conclusion, I restate my belief that *Roviaro* and *McLawhorn* are distinguishable and do not compel disclosure of the informant's identity when he does not set up or participate in the crime. Instead, *Brinkman* dictates that when an informant's involvement does not rise to the level of participating in a crime, his name need not be revealed. I believe the majority thus erred in reversing the trial court's decision to keep this information confidential. I therefore respectfully dissent.

---

**4.** It is within a trial court's discretion to determine whether the testimony of an informer is likely to be relevant to the trial of an accused. *Roviaro*, 353 U.S. at 61 n. 9, 77 S.Ct. at 628 n. 9; *Brinkman*, 739 F.2d at 980–81; *United States v.* *Soles*, 482 F.2d 105, 109 (2nd Cir.1973). Furthermore, disclosure is not required unless the trial court determines that an informer's testimony is highly relevant. *Smith*, 780 F.2d 1102, 1107.