**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

**No. 03-4897**

―――――――――――

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DANIEL VEGA,

Defendant - Appellant.

―――――――――――

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Richard D. Bennett, District Judge. (CR-02-542-RDB)

―――――――――――

Submitted: November 24, 2004      Decided: January 27, 2005

―――――――――――

Before WILKINSON and WILLIAMS, Circuit Judges, and Norman K. MOON, United States District Judge for the Western District of Virginia, sitting by designation.

―――――――――――

Affirmed by unpublished per curiam opinion.

―――――――――――

Michael D. Montemarano, Elkridge, Maryland, for Appellant. Thomas M. DiBiagio, United States Attorney, James M. Trusty, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

―――――――――――

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Daniel Vega was convicted by a jury of conspiring to distribute drugs and drug trafficking, in violation of 21 U.S.C.A. §§ 841 (a)(1) and 846 (West 1999), and sentenced to sixty-months imprisonment. On appeal, Vega contends that the district court erred by (1) refusing to disclose the confidential informant's identity, (2) allowing a jury to convict Vega without sufficient evidence, (3) applying an upward adjustment for obstructing justice, and (4) refusing to apply the safety-valve provision. Because we find no reversible error, we affirm.

I.

During several telephone calls in November 2002, Jose Mancebo, a New York resident, attempted to enter into an agreement to sell and deliver two kilograms of cocaine to a Maryland resident.[1] Unbeknownst to Mancebo, the Maryland resident with whom he was negotiating was working as a confidential informant ("the C.I."), and law enforcement officers ("the Officers") were recording the telephone conversations and orchestrating a buy-bust operation.[2]

---

[1]Eventually the drug amount was lowered to one kilogram.

[2]A buy-bust operation is "where a quantity of a controlled substance is ordered from a source of supply or a seller to bring to a certain location for a buyer. . . . Normally an informant or an undercover agent . . . make[s] a purchase. . . and then an arrest team move[s] in." (Trans. of Mot. Hr'g July 8, 2003 at 13.) Two teams of officers orchestrated maintaining verbal contact with the C.I. via cellular telephones, as well as visual contact.

On November 21, 2002, Mancebo and the C.I. finalized their agreement. Because Mancebo did not have a valid driver's license, he enlisted Vega, an acquaintance of two years, to drive him from New York to Maryland to deliver the cocaine.[3]

Near midnight on November 22, 2002, Vega and Mancebo arrived in Maryland and picked up the C.I. in Oxon Hill, Maryland. Vega and Mancebo then switched seats, so that Mancebo was driving and Vega was in the passenger seat. The C.I., who was in the back seat, directed Mancebo to drive to a nearby diner, where the Officers were waiting, to complete the cocaine sale. While in route to the diner, the Officers received a verbal signal from the C.I. that he had observed cocaine. The Officers had selected the diner as the location for the buy-bust operation because the parking lot of the diner was well-lit and easily accessible. When the three men arrived at the diner, the C.I. exited the car and entered the diner, thus visually signaling that the cocaine was in the car. When the Officers approached the parked car, they found a 960 gram brick of cocaine at Vega's feet.

The Government indicted Vega and Mancebo for conspiracy to distribute and possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C.A. §§ 841(a)(1) and 846.[4]

---

[3]The trip from New York to Maryland takes approximately four hours.

[4]Mancebo pleaded guilty to both counts on March 11, 2003 and was sentenced to forty-six months imprisonment.

While preparing his defense, Vega sought to obtain the C.I.'s identity from the Government, but the district court denied the motion after conducting an <u>in camera</u> review of the DEA-6's and the grand jury testimony of the Officers regarding the arrest of Mancebo and Vega and finding that neither contained any information material and favorable to Vega. Prior to trial, Vega also moved to suppress his post-arrest statements. At the suppression hearing, Vega testified that he waived his Miranda rights during his post-arrest interview, that he had an eleventh grade education, that he worked as a taxi driver and dispatcher, and that he is basically bilingual. The district court found that Vega, a native Spanish speaker, "showed no difficulty in an ability" to respond to questions, to read road signs, to read exhibits presented in court, or to speak with the Officers using simple words. (Trans. of Mot. Hr'g July 8, 2003 at 44-45.) The district court denied Vega's motion, and Vega has not pursued that ruling on appeal.

At trial, the Officers testified that, prior to November 22, the C.I. had dealt only with Mancebo, and that as of that date, neither the C.I. nor the Officers were aware of Vega's existence or role in the drug sale. They also testified that Vega stated he did not know the buyer of the cocaine or its origin. The Officers further testified that, during Vega's post-arrest interview, Vega waived his Miranda rights and confessed to driving Mancebo to Maryland for the drug sale in exchange for being paid one thousand

4

dollars. The prosecution also provided evidence that Vega was aware of the purpose of Mancebo's trip and corroborated Vega's story by introducing evidence of Mancebo's expired driver's license, containing Mancebo's photograph, but a fictitious name. The Officers testified that Vega did not express any difficulty in understanding and responding to their questions.

Vega attempted to rebut the prosecution's evidence by testifying that, because Vega's native language is Spanish and the Officers did not provide Vega with a Spanish interpreter during his post-arrest interview, the Officers misinterpreted his statements as a confession. Vega explained that although he did not know the reason for the trip, he agreed to drive Mancebo to Maryland because he needed to earn some money. Vega further testified that he first learned of the drug deal when, just before his arrest, the C.I. threw the cocaine into the front seat of the vehicle and it landed under his feet.

The jury, discrediting Vega's testimony, found Vega guilty of both charges. The district court sentenced Vega to sixty-months concurrent imprisonment on each count, four years of supervised release, and a $200 special assessment. In reaching that sentence, the district court decreased the offense level based on Vega's minimal participation, applied an upward adjustment for obstruction of justice based on Vega's perjury, and refused to apply the safety-valve provision because of Vega's perjury. We possess

jurisdiction over Vega's appeal under 28 U.S.C.A. § 1291 (West 1999), and now affirm.

## II.

Vega's first contention is that the district court should have ordered the Government to disclose the C.I.'s identity because the C.I. could have testified to Vega's lack of knowledge and participation in the drug transaction. We review the district court's decision to preserve a confidential informant's identity for abuse of discretion. United States v. D'Anjou, 16 F.3d 604, 609 (4th Cir. 1994).

In determining whether to disclose the identity of a confidential informant, the Supreme Court has called for a "balancing [of] the public interest in protecting the flow of information against the individual's right to prepare his defense" and "that no fixed rule with respect to disclosure is justifiable." Roviaro v. United States, 353 U.S. 53, 62-63 (1957). In applying this balancing test, a court should consider "the crime charged, the possible defenses, [and] the possible significance of the informant's testimony." Id. Following Roviaro, we have held that the informant's role in the specific investigation is one factor under the balancing test and "when the informant is an active participant in the transactions at issue instead of just a mere tipster, the failure to require disclosure of the informant's

6

identity is more likely to amount to error." <u>United States v. Blevins</u>, 960 F.2d 1252, 1259 (4th Cir. 1992)(citing <u>United States v. Price</u>, 783 F.2d 1132, 1138-39 (4th Cir. 1986)).

In its <u>Roviaro</u> balancing, the district court found that the disclosure of the C.I.'s identity could not aid Vega's defense because the C.I. never actually dealt with Vega and thus would not have any favorable information to disclose. In Vega's pre- and post-trial motions, he did not characterize the C.I. as a "participant;" on appeal, however, Vega argues that the C.I. acted as a participant in  the buy-bust and that under <u>Price</u> the identities of participants must be disclosed.

Even if we assume the district court abused its discretion in failing to reveal the identity of the participating C.I., the error would be harmless. On appeal, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). Vega's defense to the crimes charged was his recantation of his post-arrest statements.  Due to the C.I.'s brief interaction with Vega, the C.I. could have only testified to Vega's actions and statements while in the car with Vega and Mancebo.

Prior to trial, the district court carefully conducted an <u>in camera</u> review of the redacted portions of the Officers' grand jury testimonies and the DEA-6's and concluded that the reports were thorough and the redactions did not contain any material relevant

7

to Vega's defense.  Post-trial, the district court reassessed the redactions, again concluding the information was not favorable or material to Vega.  The district court found that the jury rendered its verdict with full knowledge of Vega's tangential involvement in the buy-bust and that Vega interacted with the C.I. only during the brief period when both were in the vehicle.  In addition, nothing in the record before us shows that Vega made an effort to call either Mancebo or additional law enforcement personnel involved in the buy-bust, who were fully aware of Vega's role in the transaction, to testify.  Vega's ability to call Mancebo and cross-examine the testifying Officers regarding the dispute over who possessed the cocaine, vitiated Vega's need to know the identity of the C.I.  See Blevins, 960 F.2d at 1258 (noting failure to disclose is more likely to be error when C.I. is the only person with first-hand knowledge of the crime).  Moreover, the Officers, who were positioned to observe the drug transaction, did not see the C.I. throw any object such as cocaine into the front seat of the car. Given the minimal interaction between the C.I. and Vega, the availability of alternate sources of information, and the contradiction of Vega's factual contentions by the Officers' testimonies[5], we do not believe that there is any possibility that disclosure of the C.I.'s identity could  have affected Vega's

---

[5]Our finding here that the evidence of Vega's guilt was overwhelming necessarily rejects Vega's contention that there was insufficient evidence to convict.

8

substantial rights. Accordingly, any error in the district court's refusal to order the disclosure of the C.I.'s identity was harmless beyond a reasonable doubt. See United States v. Mackins, 315 F.3d 399, 405 (4th Cir. 2003) ("[W]e must reverse unless we find . . . constitutional error harmless beyond a reasonable doubt").

In summary, we need not decide whether the district court abused its discretion because by viewing the evidence of guilt and role in the offense in its entirety, the failure to disclose the identity of the confidential informant to Vega could be no more than harmless error. See Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986) (finding that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt").

III.

Finally, Vega contends that the district court erred by applying an upward adjustment for obstructing justice and by refusing to apply the safety valve exception to his sentence. We review the application of the obstruction of justice enhancement and the safety-valve provision for clear error. United States v. Wilson, 114 F.3d 429, 432 (4th Cir. 1997).

The prosecution sought to enhance Vega's sentence under United States Sentencing Guidelines Manual § 3C1.1 (2003), because he

9

obstructed justice by willfully perjuring himself.  During Vega's post-arrest interview with law enforcement, he stated that he drove Mancebo to Maryland for the drug transaction in exchange for a fee. At trial, however, Vega testified that Mancebo did not inform him of the reason for the trip to Maryland, and that the C.I. possessed the cocaine prior to the arrest.  These statements directly contradict the statements Vega made to law enforcement during the post-arrest interview.

"[I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice." United States v. Dunnigan, 507 U.S. 87, 95 (1993). The three elements of perjury are "(1) false testimony (2) concerning a material matter (3) given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory)." United States v. Smith, 62 F.3d 641, 646 (4th Cir. 1995).

The district court found that Vega's trial testimony met the elements of perjury.  Specifically, it found

> [f]irst, that the defendant took an oath to testify truthfully before this Court and the Court finds clearly he did take such an oath.  Second, that he made false statements as to matters about which the defendant testified under oath . . . .  Third, that the matters as to which he is charged, the defendant made false statements . . .  and this Court's finding that they were material.  Fourth, that such statements were willfully made.

10

(J.A. 306.)   Based on a review of the record and the district court's thorough examination of the facts, we find that the district court correctly interpreted the  obstruction of justice provision and that the application of the two-level adjustment for obstruction of justice was not clearly erroneous.

Vega also contends he was eligible for the safety valve set forth at U.S.S.G. § 5C1.2. "The safety valve permits shorter sentences for a first-time offender who would otherwise face a mandatory minimum, provided that he meets five statutory requirements." United States v. Fletcher, 74 F.3d 49, 56 (4th Cir. 1996).   Relevant here, the safety valve provision requires the defendant "not later than the time of the sentencing hearing . . . [to truthfully provide] the Government all information and evidence the defendant has concerning the offense."  U.S.S.G. § 5C1.2. We have interpreted that provision to require "defendants to demonstrate, through affirmative conduct, that they have supplied truthful information to the Government." United States v. Ivester, 75 F.3d 182, 185 (4th Cir. 1996)(interpreting identical statutory provision, 18 U.S.C.A. § 3553 (f)(5)).   Here, the district court correctly refused to apply the safety valve provision because Vega did not truthfully testify at court.

IV.

After careful review, we find the district court did not err in preserving the C.I.'s identity, properly found sufficient evidence existed to convict, and correctly applied the sentencing guidelines. Accordingly, we affirm Vega's conviction and sentence.

<u>AFFIRMED</u>