**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 03-4215**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LAFAYETTE MCKOY, a/k/a L.A.,

Defendant - Appellant.

_____

Appeal from the United States District Court for the District of Maryland, at Baltimore.   William M. Nickerson, Senior District Judge.  (CR-99-526-WMN)

_____

Argued:  October 1, 2004            Decided:  April 29, 2005

_____

Before WIDENER and WILKINSON, Circuit Judges, and Robert E. PAYNE, United States District Judge for the Eastern District of Virginia, sitting by designation.

_____

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

_____

**ARGUED:** Michael Daniel Montemarano, Elkridge, Maryland, for Appellant.  Martin Joseph Clarke, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Thomas M. DiBiagio, United States Attorney, Charles J. Peters, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Following a jury trial, Lafayette McKoy was convicted of one count of conspiracy to distribute five or more kilograms of cocaine hydrochloride and one kilogram or more of heroin, in violation of 21 U.S.C. § 846 and 841(a)(1). Under the Sentencing Guidelines, McKoy was sentenced, *inter alia*, to imprisonment for three hundred and sixty months. McKoy appeals his conviction and sentence on several grounds.

I.

With McKoy's conviction, the United States successfully completed a three-year investigation of a drug trafficking conspiracy involving nearly twenty defendants. The first indictment, returned in November 1999, charged four conspirators. In early 2000, a superceding indictment charged three more conspirators. Then, in January 2002, after all but one of the other conspirators (who was then, and remains now, a fugitive) had entered guilty pleas, a second superceding indictment was returned charging McKoy with conspiracy to distribute heroin and cocaine hydrochloride.

Before trial, McKoy moved for dismissal of the second superceding indictment on the ground that the delay in bringing the charges had deprived him of the right to speedy trial under the Due Process Clause of the Fifth Amendment. The district court denied

that motion.  During jury selection, the United States peremptorily struck three black jurors.  McKoy supposedly made a challenge under Batson v. Kentucky, 476 U.S. 79 (1986), which the district court rejected.

At trial, the United States introduced the 2001 grand jury testimony of co-conspirator James Winkler who was terminally ill with cancer when he testified, and who died shortly after his grand jury appearance.  The district court overruled McKoy's objection to the admission of Winkler's grand jury testimony as violative of Federal Rule of Evidence 807 and as a denial of due process.  After McKoy filed his brief on appeal, the Supreme Court of the United States decided Crawford v. Washington, 541 U.S. 36 (2004).  The United States concedes that it was an error of constitutional dimension to have admitted Winkler's testimony, but asserts that the error was harmless.

McKoy appeals the adverse decisions on those points.  Also, McKoy contends that he was deprived of due process under the Fifth Amendment by the prosecutor's prejudicial closing argument.  Finally, relying on Blakely v. Washington, 124 S. Ct. 2531 (2004), McKoy attacks his sentence as violative of the Sixth Amendment.

For the reasons set forth below, we find no violation of the right to speedy trial under the Due Process Clause of the Fifth Amendment, no error in the rejection of the Batson challenge, harmless error in the admission of Winkler's grand jury testimony,

3

and no improper argument on the part of the prosecutor. Accordingly, we affirm the judgment of conviction. However, in light of the decision of the Supreme Court in United States v. Booker, 125 S. Ct. 738 (2005) and our decision in United States v. Hughes, 396 F.3d 374 (4th Cir. 2005), the case is remanded for resentencing.[1]

II.

McKoy first contends that the district court erred by denying his motion to dismiss the second superceding indictment on the ground that the pre-accusatory delay denied his right to a speedy trial under the Fifth Amendment. The district court's findings of fact with respect to allegations of pre-trial delay are not to be disturbed unless they are clearly erroneous. See United States v. Burns, 990 F.2d 1426, 1435 (4th Cir. 1993) ("Whether the Government has delayed in order to gain [a tactical] advantage . . . is a question of fact, and questions of fact are the trial court's special province.").

In United States v. Marion, the Supreme Court held that the Due Process Clause of the Fifth Amendment would require dismissal of an indictment upon a showing that "pre-indictment delay . . . caused substantial prejudice to [an accused's] rights to a fair

_____

[1] The decisions in Booker and Hughes, were issued after arguments were heard on this appeal.

4

trial and that the delay was an intentional device to gain tactical advantage over the accused." 404 U.S. 307, 324 (1971). Six years later, in United States v. Lovasco, 431 U.S. 783, the Supreme Court made it clear that prejudice caused by pre-trial delay alone does not warrant dismissal. In Lovasco, the Supreme Court held that, although a showing of prejudice makes the issue ripe for decision, courts also must consider the reasons for the delay, and that no due process violation exists where the delay is attributable to legitimate investigation of a crime. See id.

In Lovasco, the Court outlined in considerable detail why the Due Process Clause of the Fifth Amendment is not offended when the government prosecutes a defendant after an investigative delay "even if his defense might have been somewhat prejudiced by the lapse of time [taken for investigation]." United States v. Lovasco, 431 U.S. at 795. In so doing, the Court explained that:

> In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused," . . . precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to that of mere speed. . . . This the Due Process Clause does not require.

Id. at 795-76.

5

Informed by the decisions in Marion and Lovasco, we have used a two-part test for determining whether pre-indictment delay warrants dismissal. Howell v. Barker, 904 F.2d 889, 895 (4th Cir. 1990); see also Jones v. Angelone, 94 F.3d 900 (4th Cir. 1996). First, the defendant must show that he has suffered "actual prejudice" from the pre-indictment delay. Prejudice is demonstrated when the defendant has been "meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected." Jones v. Angelone, 94 F.3d at 907. Second, if actual prejudice is shown, the court then must balance the demonstrated prejudice against the government's purported need for the delay. Howell v. Barker, 904 F.2d at 895.

The record here demonstrates that the United States deferred prosecution of McKoy until it was satisfied that it promptly could establish his guilt beyond a reasonable doubt. There is nothing in the record to indicate that the prosecution of McKoy was delayed to obtain a tactical advantage. To the contrary, the record establishes that the prosecutors carefully and thoroughly developed a case against McKoy by continuing to investigate McKoy's conduct, by prosecuting others against whom the government had developed strong cases, and then by using their evidence to complete the development of a solid case against McKoy. Thus, the record shows a legitimate need for the delay.

It is difficult to ascertain what McKoy asserts to be the prejudice that he suffered as a consequence of the delay. But, it appears that McKoy claims to have lost the benefit of the testimony of Winkler, who died two years after the initial indictment but before McKoy was charged under the second superceding indictment.[2]

However, McKoy has not shown how Winkler's testimony would have aided his defense. That failure was fatal in Lovasco, and it is fatal here. Further, we have held that:

> [w]hen the claimed prejudice is the unavailability of witnesses, as here, courts have generally required that the defendant identify the witness he would have called; demonstrate, with specificity, the expected content of that witnesses' testimony; establish to the court's satisfaction that he has made serious attempts to locate the witness; and, finally, show that the information the witness would have provided was not available from other sources.

Jones v. Angelone, 94 F.3d at 908. McKoy's prejudice assertion is devoid of the requisite specificity. And, because McKoy has not demonstrated actual prejudice, it is unnecessary to undertake a balancing analysis. But, as explained above, the balance, if

---

[2] McKoy's brief identifies eight supposed consequences of the delay. However, two of the putative consequences are merely that the delay occurred. Two other asserted consequences are that there was little or no evidence against McKoy. Two other supposed consequences were that all the other co-conspirators but one had entered guilty pleas and the one who had not entered a plea was a fugitive at large. Consequences (4) and (5) are said to be that Winkler died before McKoy was indicted and that "therefore, crucial evidence vital to the defense of the charges against [McKoy[ was unavailable by [the] time he was obligated to defend himself. McKoy's Opening Brief, pp. 15, 16.

struck, clearly would fall, under Lovasco, in the prosecution's favor.

On this record, we find no violation of the Due Process Clause of the Fifth Amendment.

III.

McKoy's next argument is that he was denied the Fifth Amendment right to have a jury selected without racial discrimination in the exercise of peremptory challenges. A district court's finding respecting whether a peremptory challenge was based on a discriminatory motive is subject to great deference and is only reviewed for clear error. Jones v. Plaster, 57 F.3d 417, 421 (4th Cir. 1995).

In Batson v. Kentucky, 476 U.S. 79, 89 (1986), the Supreme Court of the United States held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable to consider the State's case against a black defendant." When announcing this rule, the Supreme Court also outlined a burden-shifting test to be applied to ascertain whether the rule had been offended.

First, the party apprehending racial discrimination in the adversary's exercise of peremptory challenge must establish a prima facie case of purposeful discrimination. To make a prima facie

8

case, "the defendant must show that the facts and any other relevant circumstances raise an inference that the prosecutor used [peremptory challenges] to exclude veniremen from the petit jury on account of their race." Id. Relevant circumstances may include a pattern of excluding jurors of a particular racial group and the prosecutor's questions during voir dire. Id. A district court's determination whether a prima facie case has been made is entitled to "great deference" and will not be disturbed unless clearly erroneous. Id. at 98.

Assuming that a prima facie case is made, the burden shifts to the party who exercised the peremptory challenge, here the prosecutor, to provide a race-neutral explanation. Id. at 96-97. That "explanation need not be persuasive or even plausible, as long as it is neutral." Matthews v. Evatt, 105 F.3d 907, 917 (4th Cir. 1997). In other words, "the party need offer only a legitimate reason for exercising the strike, i.e., one that does not deny equal protection; the reason need not be worthy of belief or related to the issues to be tried or to the prospective juror's ability to provide acceptable service." Batson, 476 U.S. at 98. The Supreme Court has made it clear that "unless a discriminatory intent is inherent in the explanation offered to defend the peremptory challenge, the reason offered will be race neutral." Matthews v. Evatt, 105 F.3d at 917. The district court's acceptance of the purported race-neutral reason for the challenge

9

is entitled to substantial deference on appeal and will be overturned only for clear error.   See Jones v. Plaster, 57 F.3d 417, 421 (4th Cir. 1995).

Third, if parts one and two of the test are satisfied, the burden then reverts to the party opposing the peremptory challenge to establish that the reason offered was a pretext for racial discrimination.   Id.   Like the first two facets of the Batson test, this decision is reviewed only for clear error.   See id.

In cases where the prosecution offers racially neutral reasons for the proposed challenges, "it is unnecessary to determine whether a prima facie case was actually demonstrated." Davis v. Baltimore Gas & Elec. Co., 160 F.3d 1023 (4th Cir. 1998). Therefore, if race neutral reasons were offered at trial, the appellate court may assume that a prima facie showing was made and proceed directly to examine whether the reasons cited were indeed race neutral. Hernandez v. New York, 500 U.S. 352, 358-59 (1991).

In this case, there were six black jurors on the venire. The district court struck one of those six for cause. Thereafter, the United States used three of its six peremptory challenges to excuse three of the remaining five black jurors.

At trial, McKoy did not actually make a Batson challenge. Rather, the issue was raised by the district court which, after challenges for cause had been decided and peremptory challenges had been made, called counsel to the bench and announced that the

10

record should reflect that the United States peremptorily had stricken three of the five black jurors remaining on the venire after one had been excused for cause. Joint Appendix at 153 ("JA at __"). The district court said: "So I just wanted you to know that before we called them in case you had any comment about it." JA at 153. McKoy's counsel then responded as follows:

> Well, my initial observation of the whole panel is that there was a sparsity of African American participants in the general panel, and I would like to know the government's reason for striking the few black people that were in the panel. The three, I know, two survived, apparently.

Id. at 154.

The United States objected "to having to respond" because a prima facie case of discrimination had not been established. Id. The district court made no ruling on the prosecutor's objection, and the United States, stating that it had "preserved the record" (presumably by its objection), then agreed to respond as to Jurors 176, 125 and 101, the three black jurors who were peremptorily removed. Id.

Before addressing the merits of the issue, we note that a defendant does not animate the obligation of the United States to provide reasons for its peremptory challenges merely by expressing a desire to hear those reasons. See Matthews v. Evatt, 105 F.3d 907, 917 (4th Cir. 1997)(defining the necessity for, and the sufficiency of, a prima facie case). However, because the district court raised the issue and then did not sustain the objection of

11

the United States, we will proceed as if the district court had found that McKoy had made a prima facie case.[3]

The United States justified its challenge of Juror No. 176 on the ground that he could not be fair because two of his brothers had been convicted of selling drugs and were serving terms of incarceration. The juror also thought that one brother had been unfairly treated. JA at 155. The United States justified its challenge of Juror No. 125 on the ground that he would be sympathetic to the defense because his stepfather had served thirty years in prison for a murder conviction and because the juror lived near the prison where several prosecution witnesses were incarcerated. Id. at 156. The United States explained its challenge of Juror No. 101 on the ground that he seemed emotionally distraught because of the recent death of two nieces and because, as a person with a heavy Jamaican accent, the juror would have difficulty understanding some of the prosecution's witnesses who (at trial and on surveillance tapes) spoke English with a strong Spanish accent. Id. at 157-58.

The district court held that the United States had offered racially neutral reasons for its challenges to Juror Nos. 176, 125 and 101.[4] We find no error in the district court's decision.

---

[3] In so doing, we do not conclude that the record here establishes a prima facie case of discrimination under Batson.

[4] McKoy made no showing that the proffered race neutral reason was a pretext for a racially motivated challenge. Matthews, 105 F.3d at 917.

12

IV.

Before trial, McKoy moved to preclude the United States from admitting into evidence the testimony that James Winkler, the deceased co-conspirator, had given to the grand jury shortly before he died. The transcript of the testimony shows that Winkler and the prosecution were aware that Winkler was terminally ill when he testified before the grand jury. Winkler testified at length about the conspiracy and, to a lesser extent, about McKoy's role in it. The transcript was read at trial.

When McKoy's motion was considered by the district court and when McKoy filed his opening brief on appeal, the controlling law was supplied by Ohio v. Roberts, 448 U.S. 56 (1980) and United States v. McHan, 101 F.3d 1027 (4th Cir. 1996). However, before the United States filed its brief in this appeal, the Supreme Court decided Crawford v. Washington, in perspective of which the United States rightly has conceded that admission of Winkler's grand jury testimony was constitutional error. However, the United States asserts that the error was harmless. To that issue, we now turn.

Recognizing that our judicial system is susceptible to mistakes committed by "fallible human beings," "[a]ppellate courts long ago rejected the notion that reversal is necessary for any error committed by a trial court." United States v. Blevins, 960 F.2d 1252, 1261 (4th Cir. 1992) (citing Rose v. Clark, 478 U.S. 570, 579 (1986)). That, in turn, has led to the fundamental

13

precept that "'[a] defendant is entitled to a fair trial, but not a perfect one.'" United States v. Blevins, 960 F.2d at 1261 (quoting Latwak v. United States, 344 U.S. 604, 619 (1953) and citing Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986)).

Until the Supreme Court's decision in Chapman v. California, 386 U.S. 18 (1967), it was widely considered that constitutional violations which occurred at trial could never be harmless error. Wayne R. LaFave et al., Criminal Procedure vol. 5, § 27.6(b), 944 (2d ed., West Group 1999). Although, in Chapman, the Supreme Court rejected the notion that all constitutional errors at trial necessitated automatic reversal, the Court also held that constitutional errors should be measured against a higher level of scrutiny than non-constitutional errors. Chapman, 386 U.S. at 23. Recognizing that non-constitutional errors can be treated as harmless if there is no "reasonable possibility that the evidence complained of might have contributed to the conviction," the Court in Chapman announced that constitutional errors are harmless only if the reviewing court is "able to declare a belief that [the error] **was harmless beyond a reasonable doubt**." Id. (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963)) (emphasis added).

Beginning with Chapman and continuing in a line of decisions thereafter, the Supreme Court has formulated a two-part analysis for assessing the import of constitutional errors committed by trial courts. Under the first facet of the Chapman test, the

14

reviewing court determines whether the error is in a class of violations subject to the harmless error rule ("trial errors") or, instead, is within a rather narrow category of errors that require automatic reversal ("structural errors").[5] Wayne R. LaFave et al., Criminal Procedure vol. 5, § 27.6(b), 945-46 (2d ed., West Group 1999).

Because a "trial error" occurs during the presentation of the case to the jury, the error "may be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was **harmless beyond a reasonable doubt**." Arizona v. Fulminante, 111 S. Ct. 1246, 1264 (1991) (emphasis added).  That determination, of course, is the second component of the Chapman test.

Over a dozen constitutional errors have been deemed trial errors that are subject to review under the second part of the Chapman analysis:

> (1) Improper admission of an involuntary confession; (2) overbroad jury instructions at the sentencing stage of a criminal case; (3) improper admission of evidence at the sentencing stage of a criminal case; (4) jury instructions containing erroneous conclusive or

---

[5] Structural errors "affect 'the entire conduct of the trial from beginning to end, such that any attempt by a reviewing court to isolate the impact of the error would be fruitless.'" United States v. Blevins, 960 F.2d 1252, 1261 (4th Cir. 1992)(quoting Fulminante, 111 S. Ct. at 1254).  Examples of structural errors include bias on the part of the presiding judge, the total deprivation of the right to counsel, and the right to self-representation. Fulminante, 111 S. Ct. at 1254 (collecting cases).

15

rebuttable presumptions; (5) erroneous exclusion of a defendant's testimony regarding the circumstances of his confession; (6) improper restriction on a defendant's right to cross-examine a witness for bias; (7) denial of a defendant's right to be present at trial; (8) improper comment on a defendant's silence at trial; (9) improper prohibition on the provision of a lesser included offense instruction in a capital case; (10) failure to instruct the jury on the presumption of innocence; (11) **erroneous admission of an out-of-court statement of a non-testifying co-defendant;** (12) improper admission of a confession made to an undercover officer; (13) admission of evidence obtained in violation of the Fourth Amendment; and (14) improper denial of counsel at a preliminary hearing.

Wayne R. LaFave et al., Criminal Procedure vol. 5, § 27.6(b), 948-49 (2d ed., West Group 1999)(emphasis added). In obvious recognition of the fact that the erroneous admission of Winkler's grand jury testimony came during the presentation of evidence, and, thus, that "the impact of the error can be evaluated in light of the evidence which was properly admitted," United States v. Blevins, 960 F.2d at 1262, McKoy rightly does not argue that a structural error analysis is called for here.

To determine whether the admission of the grand jury testimony was harmless beyond a reasonable doubt, we review the "trial record as a whole," United States v. Hastings, 461 U.S. 499, 509 (1986), and ask "whether it is clear beyond a reasonable doubt that the jury would have returned [a guilty] verdict" against McKoy even if Winkler's testimony had not been introduced. United States v. Blevins, 960 F.2d at 1262. This determination requires "a quantitative assessment of the likely impact of the error measured

16

against the other evidence presented at trial." Id. at 1263. It also involves a qualitative assessment of the proof such as whether the erroneously admitted evidence was cumulative of other evidence that establishes guilt beyond a reasonable doubt. See, e.g., Brown v. United States, 411 U.S. 223, 231 (1973) (holding that erroneously admitted statements of the defendants constituted harmless error because that evidence was merely cumulative of other evidence presented at trial). Applying these precepts, we will assess Winkler's grand jury testimony as it pertained to McKoy's participation in the drug conspiracy against the other trial evidence of his participation.[6]

At the grand jury, Winkler testified that he sold cocaine and heroin out of a stash-house apartment in Baltimore, Maryland. JA at 504-506. Winkler approximated that he and his associate, Julio Cabrera-Mena, distributed two to three kilograms of heroin per week out of the apartment. Id. at 509. Winkler identified McKoy as an individual to whom, among others, Winkler sold heroin at that location. Winkler also said that he sold heroin to McKoy's friend, an individual known to Winkler as "Big E." Id. at 511-13. Winkler particularized the transactional mode by explaining that, when Big E and McKoy came to the apartment to purchase heroin, Big E usually

---

[6] There is no doubt that the properly admitted evidence established the existence of a conspiracy beyond a reasonable doubt. Thus, Winkler's testimony on that point is harmless beyond a reasonable doubt because it is cumulative.

17

came into the apartment to make the purchase, while McKoy waited in the car. Id. The exception to this pattern occurred when, Julio Cabrera-Mena, who was the connection to the New York supplier, was present. Winkler also testified that, on six or seven occasions, he accepted money from McKoy (delivered by Big E) to give to Cabrera-Mena who purchased heroin from a supplier in New York. Id. at 531-33. According to Winkler, McKoy received heroin from Cabrera-Mena approximately once a week. Id. at 544.

Mindful of what Winkler said, we now must assess the rest of the trial record to determine the effect of Winkler's grand jury testimony on the guilty verdict returned by the jury that heard and considered this tainted evidence. In so doing, we note that no less than eight cooperating witnesses testified about McKoy's role in the cocaine and heroin conspiracy. Five of these cooperators also were named as co-conspirators under the original and superceding indictments in this case.

The first of these cooperating witnesses, Julio Zorilla, who knew McKoy by the name "LA," testified that he delivered various quantities of cocaine and heroin to McKoy on seven occasions at the request of his employer, Julio Cabrera Mena. Id. at 378-99. Zorilla testified that these deliveries took place at McKoy's townhouse apartment on Clyburn Avenue. In describing the various quantities of heroin and cocaine that he delivered to McKoy for Cabrera-Mena, Zorilla testified that:

18

> Sometimes it would change. Sometime [sic] 18 ounce of cocaine, sometimes 30 gram, 40 gram of heroin. Sometime a whole key of cocaine, sometime a half key of cocaine.

Id. at 382.

In his brief, McKoy seeks to negate Zorilla's testimony by arguing that this witness did not know McKoy. Reply Brief of Appellant at 6. However, nothing in the record supports this contention and, indeed, it is undermined by McKoy's own admission to FBI Special Agent Nick Yiannos (serving under cover) that McKoy had dealt in drugs with Zorilla "a long time ago." Amended First Supplemental Joint Appendix at 127. Further the United States introduced transcripts of several telephone conversations between Zorilla and other co-conspirators, during which Zorilla discussed McKoy's role in the drug trade. See id. at 254-55. In addition to Zorilla, another of the Cabrera's drug couriers, Juan Melendez, testified that he also delivered heroin to McKoy. Id. at 185-88.

In addition to Zorilla and Melendez, both of whom testified that they supplied cocaine and heroin to McKoy, the prosecution offered evidence from two low-level street dealers, James McKnight and David Curtis, who testified that they distributed cocaine and heroin on McKoy's behalf. Curtis testified that he witnessed McKoy give two individuals a bag, the contents of which Curtis later discovered included ten "fingers" of heroin. Id. at 168. McKnight testified about his relationship with McKoy as follows:

19

Q. Were you performing any other duties for Mr. McKoy?

A. Yes.

Q. All right. What were they?

A. I was the delivery person and pick-up person.

Q. All right. Where did you deliver to?

A. To the apartment.

Q. Where would you – all right. Deliver, what would you deliver to the apartment?

A. Heroin and Cocaine.

Id. at 015. In addition to making deliveries, McKnight testified that he sold cocaine and heroin that he had obtained from McKoy's apartment every one to two days. JA at 341-45. Further, McKnight testified that McKoy taught him how to dilute pure heroin for street distribution. Having acquired that knowledge from McKoy, McKnight began receiving heroin and cocaine from McKoy so that McKnight could supply his own street distribution operation. Id.

McKoy tries to undermine the effect of this witness by characterizing him as a "veteran level drug dealer." That is no doubt true, but McKoy's relationship with McKnight was established by transcripts of tape-recorded conversations between Zorilla and Julio Cabrera-Mena introduced at trial. During one of these conversations, Cabrera-Mena characterized McKnight as "LA's" [McKoy's] friend. Id. at 255. Further, during this conversation, Cabrera-Mena outlined how McKoy supplied McKnight with illegal drugs. Id. at 256. In short, notwithstanding McKnight's "veteran

20

level drug dealer" status, there was ample independent corroborating evidence presented at trial to establish the relationship between McKnight and McKoy.

The United States also introduced McKoy's own statements about his drug-related activities. Those admissions were elicited during the course of several conversations between McKoy and FBI Special Agent Yiannos, who posed as a drug paraphernalia salesman. Yiannos recorded his conversations with McKoy and the tapes were played at trial. During one of those conversations, McKoy explained the extent of his drug dealing to Yiannos:

> I got some dudes . . . I got some dudes, that they be . . . they be, uhm . . . they be, they be going around and buying coke and the rock, right, and whatnot. And you know they may like wanna buy a lot of it, uhm, you know. But the other thing is my thing. I don't ... you know. **I deal with the, with the, with the heroin. That's all. You know.**

Id. at 285 (emphasis added). McKoy then expressed interest in buying heroin from one of Yiannos' contacts. Id. at 287-88.

McKoy addresses this evidence by arguing that Yannios was unable to "inveigle an admission from him." That assertion ignores the fact that, in the conversation, McKoy clearly admitted that he "deals heroin," and the jury reasonably could have construed the first part of McKoy's comments to mean that others dealt cocaine powder and cocaine base for him. And, indeed, the testimony given by the co-conspirators and the cooperating witnesses, as outlined

21

above, fully corroborated both that conclusion and McKoy's admission respecting the heroin dealing.

Finally, the evidence presented at trial included a chart that outlined McKoy's communications with his co-conspirators. Specifically, the United States demonstrated that, during an eight-month period, from April 1999 to January 2000, McKoy communicated with co-conspirators James McKnight, Eric Jenkins, Julio Cabrera-Mena, Juan Melendez, and James Winkler, by telephone, cell phone, and pager, a total of 1,682 times. Supplemental Joint Appendix at 248-53.

McKoy's principal argument that Winkler's grand jury testimony was not harmless error is that "Winkler's testimony provided the "necessary link between circumstantial evidence and unbelievable criminals." Reply Brief of Appellant at 5-6. The record, considered as a whole, discloses that, while Winkler's testimony does link McKoy with his co-conspirators, it is not, as McKoy urges, the only link. The record is replete with other first hand accounts of McKoy buying and selling cocaine and heroin. Further, the record contains McKoy's own admission that he is a heroin dealer. Finally, the United States presented, and the jury considered, an impressive array of circumstantial evidence, such as telephone records, tax returns, and drug-tally sheets, all of which supported what the co-conspirators, the cooperators, and McKoy himself had to say. In short, Winkler's testimony is largely

22

cumulative of the abundant quantum of other evidence presented at trial that establishes, beyond a reasonable doubt, that McKoy was a member of the conspiracy, the existence of which also was established beyond a reasonable doubt.

## V.

Next, McKoy contends that his conviction must be overturned because of allegedly improper remarks made by the prosecutor in closing argument. We review a district court's factual findings on prosecutorial misconduct for clear error. See United States v. McDonald, 61 F.3d 248, 253 (4th Cir. 1995).

First, McKoy argues that the prosecutor impermissibly referred to the fact that McKoy did not testify, thereby violating the Fifth Amendment. See Brief of Appellant at 23. McKoy preserved this issue by objecting to the argument and moving for a mistrial. The district court denied McKoy's motion for a mistrial, decided to give limiting instructions instead, and made the following findings:

> With respect - I'm going to deny your motion with respect to the first point. I'm going to give the jury instructions, but I gave them instructions at the outset and I'm going to repeat it, that the defense has no burden to produce any evidence whatever. It's entirely on the government. And also the jury will be told that anything that they heard from counsel with respect to legal principles they have to give deference to what I tell them. It's not what counsel tells them. So any differences they go by what I tell them.

23

JA at 493-94. We find no error in the district court's handling of this matter.

The Constitution clearly "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Bates v. Lee, 308 F.3d 411, 420 (4th Cir. 2002)(quoting Griffin v. California, 380 U.S. 609, 615 (1965)). Improper comment on the defendant's failure to testify occurs when "the language used [is] manifestly intended to be, or . . . [is] of such character that the jury would naturally and necessarily take it to be a comment on the failure of the defendant to testify." Id. (quoting United States v. Anderson, 481 F.2d 685, 701 (4th Cir. 1973)).

Specifically, McKoy objects to the following argument by the prosecutor:

> And remember one thing, ladies and gentlemen, I think this is important. The defense is provided with all these tapes that you heard, every one of them. We gave the excerpts of the important parts of defense. If there was an issue, they wanted to bring it up, they could have certainly cross-examined, could have done it.
> We had the issue with the Spanish tapes. In fact, there was an issue as to the translation. What's this translation? No, that isn't the proper translation, that could be brought up. And you didn't hear a word about that.

JA at 480. This rebuttal argument was made in response to the assertion by McKoy's counsel that the some of the tapes offered by the United States were improperly translated. In arguing that the translation was accurate, the prosecutor made the point that McKoy

24

could have cross-examined the United States' witness if McKoy had wanted to challenge the veracity of the translation. Noting the absence of any such cross-examination, the prosecutor argued that the tapes were, in fact, accurately interpreted and, thus, should be credited by the jury. See Brief of Appellee at 33-34.

We are of the view that, in rebutting McKoy's unfounded argument that the translations were dubious, it was permissible for the United States to point out that McKoy had failed to challenge the translation when he had the opportunity to do so: on cross-examination. Except by the most strained reading, the statement of which McKoy complains cannot be construed to be a comment on his failure to testify. Rather, the statement simply asserts that McKoy did not take the opportunity to challenge the translation. Hence, the statement is not a comment on McKoy's failure to testify, and the argument was not improper. The district court properly denied the motion for mistrial on that ground and issued the proper, albeit unnecessary, limiting instruction.

Second, McKoy contends that the United States made an improper argument by using inflammatory language. Specifically, McKoy takes issue with the following argument:

> Because what happened during that time, ladies and gentlemen, is that he and his crew, to use his terms, spread **poison** of cocaine and heroin, and I don't use that lightly.

JA at 491 (emphasis added). McKoy objected to the characterization of the drugs that he was alleged to have conspired to distribute,

25

cocaine and heroin, as "poison," and moved for a mistrial which the district court denied.

With respect to McKoy's contention that the United States' characterization of heroin and cocaine as "poison" constituted improper argument, the district court found that:

> The other one with respect to poison, it's argument. There is a somewhat fine line as to where an argument can become overly inflammatory. In my view, Mr. Peters didn't cross it, so motion denied.

JA at 494.

It is well-settled that prosecutors enjoy wide latitude in arguing to a jury, because "the adversary system permits the prosecutor 'to prosecute with earnestness and vigor.'" Bates, 308 F.3d at 422 (quoting United States v. Young, 470 U.S. 1, 7 (1985)). The scope of this Court's review is "limited to whether the comments rendered the proceeding so fundamentally unfair as to constitute a denial of due process." Id. (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)). In applying this standard, we examine "the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." Boyd v. French, 147 F.3d 319, 329 (4th Cir. 1998).

The evidence presented at trial clearly demonstrated that McKoy had engaged in a conspiracy to distribute cocaine and heroin. We agree with the district court that the United States' "poison" characterization was within the proper bounds of closing argument.

26

Even if that characterization of heroin and cocaine was improper (which it was not), any potential prejudice that resulted was mitigated by the judge's charge to the jury about the role and weight of closing arguments and the overwhelming evidence of guilt presented at trial. We find no error in the decision of the district court.

VI.

Lastly, McKoy argues that, in light of the Supreme Court's decision in Blakely v. Washington, 124 S. Ct. 2531 (2004), his sentence is unconstitutional. McKoy contends that the maximum offense level warranted by the jury's verdict was 32. McKoy argues that his offense level was unconstitutionally enhanced to a level 38 based on the district court's findings of drug weight and McKoy's role in the offense.

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the Sixth Amendment is violated when a district court imposes a sentence that is greater than the maximum sentence authorized by the facts found by the jury or admitted to by the defendant as part of a guilty plea. The Court held that certain provisions of the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 et seq. violated the Sixth Amendment. In particular, the Supreme Court found offensive § 3553(b)(1), which mandated that the district courts apply the Federal Sentencing Guidelines to impose

27

a sentence partly on the basis of post-conviction factual findings. Finding no meaningful distinction between the binding nature of the federal guidelines and the state guidelines at issue in Blakely, the Court held that the federal guidelines also violated the Sixth Amendment.

However, the Court severed and excised § 3553(b)(1) - the portion of the Sentencing Reform Act that made guideline sentences mandatory.[7] By removing the mandatory provision from the statute, the Court rendered the Guidelines "effectively advisory." Thereafter, the Supreme Court concluded that, although the district courts would still have to consider guideline sentencing ranges, the courts would have the authority "to tailor the sentence" in light of the factors enumerated in § 3553(a).

In United States v. Hughes, 2005 U.S. App. LEXIS 4331, *___ (4th Cir. March 16, 2005), we held that, even though district courts are no longer bound by the guidelines, district courts must take them into account, and we set forth the appropriate framework for considering the guidelines as follows:

> Consistent with the remedial scheme set forth in Booker, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines as well as other relevant factors set forth in § 3553(a) before imposing sentence. If the court imposes

---

[7] In addition, the Court excised § 3742(e), which provided for automatic de novo review in cases where the district courts imposed a sentence outside of the applicable guidelines range.

28

> a sentence outside the guideline range, it should explain
> its reasons for doing so.

Id. at *10.

The sentence imposed on McKoy is not valid under the decisions in <u>Booker</u> and <u>Hughes</u>, neither of which was operative when the sentence was imposed. Therefore, this case will be remanded for sentencing in accord with those decisions.[8]

For the foregoing reasons, the judgment of conviction is affirmed, the sentence is vacated, and the case is remanded for sentencing with instructions.

<u>AFFIRMED IN PART</u>,
<u>VACATED IN PART</u>,
<u>AND REMANDED</u>

---

[8] This disposition makes it unnecessary to consider McKoy's Motion For Leave To File Supplemental Brief And For Re-Argument and his Further Motion For Leave To File A Second Supplemental Brief. Both motions will be denied as moot and without prejudice to asserting the points therein made to the District Court on resentencing.